Governor, I'd like to reserve four minutes for rebuttal. You may do so, counsel. Just keep an eye on that clock. It should be up on the screen there for you to see. Very good. May it please the court, my name is Matt Staver. On behalf of the appellants, I respectfully request that this court grant the IPA because the orders violate the First Amendment and the appellants are in need of emergency relief. From the first stay-at-home order until the most recent blueprint, the orders have continued to discriminate against non-religious and religious activities, both internally as well externally. Internally, the churches are permitted to engage with unlimited numerical numbers for various kinds of non-religious activity. But as soon as it becomes a religious activity or worship, the numerical numbers or the ban or the restrictions kick in. With regards, counsel, let me ask at the outset, what is the precise scope of the injunctive relief that you are requesting? Go ahead. Your Honor, we're requesting at least a similar treatment to similar activity. But one of the things that we have here, both internally and externally, is clearly on their face and as applied, dissimilar treatment. For example, in the internal operation of the churches, they can engage in non-religious activity with no numerical restrictions, but with social distancing and the other health protocols. But as soon as... Counsel, it would be very helpful if we had an idea specifically of what it is you're asking for us. If you're just asking for an injunction in general, that really doesn't help us very much. For example, are you asking us to allow in-person religious services in all of California and without restriction or something more tailored? We're asking for the in-person restrictions to be no greater than other similar related activities. The complaint clearly indicates that Harvest Rock Church engages in a lot of hygienic practices, sanitizing, masks, social distancing, and even encourages people to stay at home that may have predisposed health conditions. But that is not even possible with the religious activity in those counties. Yet at the same time, with the same church, with many of the same people, they can engage in unlimited activity with different people, no limitations, other than the hygienic and social distancing and mask and other kinds of requirements that they are certainly willing to do for religious services, but they're not even allowed to do that. For the non-religious services, they have no limitation other than those health CDC guidelines. Counsel, I'm sorry to pursue this, but we need some help on what specific activity or category comparison do you believe shows that the state has treated religious services less favorably than comparable secular activities? And I assume you're talking about the level of COVID exposure risk. That's correct, Your Honor. And with that, I say that Lukumi says that the state's restrictions fall well below the minimum standard to protect first-limit activity when Lukumi treats the risk differently between religious and non-religious activities. So with counsel, counsel, counsel, excuse me, but it's me up here. I'm trying to think carefully and trying to hear an answer to Judge O'Scallion's question. I have the same question. The question is, what's the most comparable secular activity that you contend is treated more favorably than worship? Well, let's look, Your Honor, both internally and then I'll go externally. What I mean by internally is I mean activities in the same church that are non-religious, that have no numerical or percent limitations other than the CDC guidelines. And that is feeding, sheltering, and providing counsel to individuals of whatever nature, necessities of life, social counseling, unemployment counseling. But whenever the pastor then transitions from feeding to communion, restrictions kick in, or counseling for unemployment to counseling from the Bible, the restrictions kick in. So that's- Could I follow up on that, please? Because I noticed that your briefing talks about the charitable work that your congregations do to feed people, to clothe them, and so forth. But I can't find any evidence in the record that would help me quantify that activity, how long people are in the church, how long they're in close proximity. Is that in the record, sir? Well, what's in the record, and I'll show you the different paragraphs. It's 51, 55, 71 to 73, 78, 99 to 102, and 179. Those are the paragraphs that address it. It doesn't go into numerical numbers because- So right there, right there, if I can, forgive me for interrupting, but I'm trying to get my arms around this. That's what I mean about, and I think it's what Judge O'Scanlan means, about a comparable activity, a comparable exposure. So that's why we're looking for the closeness in proximity, and the duration of time people would be conducting these indoor activities. Is your answer that I have to find it in those paragraphs? Is that where I look? That's where you would look. And the Harvest Rock Church has the Hope Center, which it does provide these kinds of activities within the church. And the only restrictions they have are the CDC guidelines. But if they switch to a religious service, the other percentage and restrictions come in external. And by the way, that comes under critical infrastructure, where these shelters, counseling, social services, necessities of life, that comes under critical infrastructure. And that has been no change between the beginning until even now with the blueprint. Other areas that are external, I would say, would include, for example, if you look at in the exhibit, exhibit A of the Joint Statement, there's a number of them. Let me begin with museums. The museums under tiers two through four have a 25%, a 50%, and no restriction under tier four. By comparison, for example, under tier two, the churches have a 25%, but no greater than 100 people. And when you get to tier three, a 50%, but no greater than 200. Museums don't have that numerical limiter. Gyms and fitness centers under tiers two through three have a 10%, 25%, and a 50% limit. With, again, no numerical number to count them, just the percentage of what's in the building. Family entertainment in tier three has a 25%. Card rooms, other kinds of places where you're gathering for wagering under tiers three and four have a 25% and 50%, but no numerical limit. Laundromats, where people gather, are in the critical infrastructure, tiers one through four, no restrictions. Malls and destination centers and swapmates have a two through four, 50%, none, and none. Now, if you look at Harvest Rock, for example, it has 1,250 people. And if you were even to do the low number, when it gets to tier two for gyms, tier two can have 10%. Harvest Rock can only have no more than 100 people. With 10% in Harvest Rock would be, for the 1,250 seats, 125. When you get to the 25% of tier three for gyms, for example, or the other tier threes here, 25% limitation with no numerical limit. But yet, if you did 25% for the churches, they would be able to have only 312, no matter what size their facility is. And then for 50% of the Harvest Rock, just as that being the example, 625 people. But when you get to the gyms, 50% in tier four, no numerical limits, just depends upon the building size. And you have the same thing with the card rooms and the satellite waging 50%, no cap other than the size of the building. Yet, when we get to 50% or that, we have a 200 person limit. So it's very significant in terms of the restrictions. 100 people when we get to tier two and only 200 people when we get to the later tiers. Yet, when you look at all these other places where people are congregating for periods of time, museums, family entertainment, the card rooms, being around the same card, wagering, laundromats, the malls and the destination centers and the swap meets. They're all gathering together. And so the risk there is just as great or greater than the risk at a church that has a socially distanced meeting for a shorter period of time. In fact, if you look at all of the guidances, every one of the guidances that are listed in the exhibits to the joint statement, they all say the same thing. And that is this, that they have no data currently available that shows the level of risk. Every single one of the guidances have that. And then when you look at the guidance for the church, it has that as well. Same thing, but it limits the building capacity to 25% or 100 attendees. Yet that same 100 number is not imposed on these other places where there's congregating. Moreover, when we filed the lawsuit, the schools were shut down. But now under the blueprint, the schools can reopen. And based upon the exhibit that's in here with regards to schools, it says California public schools, traditional and charter, private schools, including non-public, non-sectarian school districts and county offices, will determine the most appropriate instructional model. And so they are to follow different health guidelines, but there's no numerical limitation. And yet that poses just as much, if not greater, a risk because they're there much longer in a classroom rather than a 1,250 seat sanctuary as just one example. So those risks are as great, or in my view, certainly I would present greater, because, for example, in the schools, the exposure is much longer than you would have in a worship service that's socially distanced. And so that's the dissimilar treatment, Your Honors, that we're talking about, both internal as well as external. In fact, going back to the internal, under exhibit C of the joint statement on page three, and this is true for all of our restrictions from the very beginning, we pointed that out in exhibits J, K, and L. They're all on the same page three. This is from the blueprint on page three of exhibit C. It says that these restrictions on the numbers, 25% or 100 people when you get to that level, they do not apply to educational activities or counseling and, quote, any other activities that places and organizations of worship may provide. So on its face from the very beginning exhibits J, K, and L of the complaint, and exhibit C, all on page three of the joint statement, say that within houses of worship, these restrictions that are in these guidances do not apply to these other non-religious activities that houses of worship can do. So you have both an internal discrimination, as I mentioned earlier, and you have what has become more exacerbated and clear with the blueprint. You have a clear discrimination on the face of exhibit A for our joint complaint, joint statement of the discrimination with respect to these external operations, where there are people that congregate and gather for longer periods of time. And with that, we don't even need to go to the argument, although I think it's relevant to shopping centers and big box centers, where employees can gather for eight hours a day and five days a week. And yet they don't have those numerical restrictions like we have here, where we have a 25% or 100, whichever is less, a 50% or- A council, your opposing council is probably going to say that these restrictions were designed in relation to the level of COVID exposure risk. What is your response to that? Well, I'm sure that that is certainly the argument, but on the other hand, when you compare the activity together and the length of exposure, both internal that the churches can do and external, when you compare them to similar other congregate kind of activity, that really is undercut. Well, they may say that, and I'm not going to doubt that that is a reason why they wanted to put different restrictions on different situations, but they have missed the target. And under their least restrictive means, they failed miserably. And in fact, instead of helping the situation, they've exacerbated the situation with the current blueprint. Because literally on the face of it, when you go through these different tiers, as I pointed out, there is facial discrimination. And that is directly implicated with Rukumi. Because on the face, you have to decide whether the activity in the church or outside, the congregate kind of activity is religious or not. And if it's religious, it has one set of restrictions, very little internally, and less restrictions than similar congregate kind of activity externally. And so it didn't help anything. And frankly, it hurt. And frankly, when you can have schools, which weren't allowed at the time that we filed the complaint, but are allowed now. But even back then, by the way, the exhibits JK and L of the complaint, which exhibit C of the joint statement says on page three, educational services were always exempt. I don't know if they were thinking at the time, but clearly now, what we know from the exhibit number F of the joint statement regarding schools, schools can clearly open. And it's not a state mandate. It's up to the individual local bodies to determine that with no numerical limitation. So, for example, if a school, if a church had a school, they could gather people together and have no numerical limitations without a absolute cap. But as soon as they switch to worship, either they're banned in most of the state, or alternatively, they're restricted to a top level numerical number. Your Honor, I noticed that you're now just below four minutes. You mentioned that you wanted to reserve, so I leave it up to you. I'll reserve for the rest of my time, Your Honor, for rebuttal. Very well. We will hear from the governor. Counsel for Governor Newsom. Yes, Your Honor. May it please the court. Deputy Attorney General Todd Grabowski on behalf of Governor Gavin Newsom. This court should deny plaintiff's motion for two general reasons. Plaintiffs have failed to demonstrate a likelihood of success on the merits because the COVID-related restrictions on large indoor gatherings, including worship services, are generally applicable and neutral and are rationally related to protecting public health and safety. Second, the balance of equity here, we heavily consider the public interest in combating the COVID-19 pandemic. I'll remind the court that 200,000 Americans have died. Rates of death are about 1,000 a day. 15,000 Californians have died. Well, counsel, as you heard my concern with appellants, counsel, we need to be more specific. It seems to me counsel has offered quite a few examples where the comparisons simply don't fit. In other words, the risk of exposure in one setting is not equivalent to what it is in a church setting. And I think the state seems to have the obligation to persuade us on that. Yes, Your Honor. This court in Sormons held the mutipresence of some secular exemptions doesn't automatically mandate a religious exemption. He was fading in and out, counsel. Do you all hear, counsel? Judge Wallinson? I said he was fading in and out. I couldn't hear him well. I'm sorry, Your Honor. Can everyone hear me now? Yes. I think so. Stay close to your mic, counsel. That would be helpful. Sure. When we're looking at which activity, you know, to determine substantial under-inclusivity, the mere presence of any secular exemption doesn't automatically mandate an exemption for religious activity. Rather... Well, yeah, but we're dealing with the First Amendment and strict scrutiny applies. And even on rational basis scrutiny, you still have to persuade us that the distinctions between these classifications are valid, as suggested by your opponent. Yes, Your Honor. First, we can address the activities that opposing counsel points to. So we'll start with shopping, for grocery shopping. I'm sorry, excuse me for one moment on a technical matter. I don't see opposing counsel has even dropped from the... Does anyone else see Mr. Staber? Oh, there he is. Okay. All right. I'll stand up. Very well. Okay. Counsel, you may continue. I'm sorry for the interruption. That's all right. But first off, I'll note that activities that involve large groups of people gathered together for a lengthy amount of time, engaging in singing and chanting and a shared communal experience are all treated the same or more stringently as worship services. Concerts, spectator sporting events, theatrical performances are all... Well, wait a minute. Spectator sporting events, there are no limitations or very light limitations on spectator events. Isn't that true? And there's a lot of shouting going on in a sporting environment. In California, Your Honor, spectator sports are not permitted, statewide, indoor, outdoor. Spectators can't go to the Staples Center or to Dodger Stadium to watch the sports. That's not permitted. Movie theaters are treated exactly the same as worship, again. Concerts, lectures, theatrical performances, theme parks, conferences are all prohibited statewide, indoors or outdoors. Opposing counsel points to shopping, grocery shopping, or retail shopping. I'll first note that plaintiffs have presented no evidence, none, no scientific evidence at all or medical evidence or epidemiological evidence that going to the grocery store poses a greater risk than going to a large gathering indoors, including houses of worship. To the contrary, the state has presented testimony from the state's head epidemiologist, Dr. Watt, explaining just that, that going to the grocery store poses a lesser risk of COVID transmission than a large indoor gathering like a worship service. And that makes sense because in stores, people enter the stores at different times. Interactions among people is fleeting and transitory. People move around the store. If they have to pay for the items, the cashier is behind a Plexiglas screen. They pay for the items and then they leave. Stores are subject to a host of occupational health and safety regulations that could mitigate the spread of the disease. And this makes sense given what we know about how this virus spreads. In the vast majority of cases, the virus spreads from person to person through respiratory droplets. So there's a much greater probability of spread when you have a large amount of people in an enclosed area in this in general proximity. There's a much greater probability that the virus would spread from one person to another just because you're sitting together for a long period of time, whereas in retail stores, interactions with people are transitory. Well, counsel, as I understand it, and I hope I'm not mistaken on this, but as I understand it, food processing, meatpacking and warehouse operations are less restricted than churches. And we know how high risk meatpacking operations are from outbreaks in other parts of the country. First, opposing counsel has presented no evidence, and I don't think that they're making that argument about factories or meat processing plants. Secondly, factories don't engage workers in factories don't engage in singing and chanting activities that are common in houses of worship. And third, but I thought there wasn't there. Isn't there a ban on singing and chanting right now under other restrictions? In other words, the activity of singing and chanting. Yes, Your Honor, that singing and chanting is prohibited indoors for indoor worship services, just like it is for indoor protests, just like it is at schools and at restaurants. Well, then why couldn't church? I'm sorry, Judge Rawlinson. Go ahead. No, go ahead and finish up out, Judge O'Scanlan. Well, I was just saying if that's the case, why can't church services be allowed to proceed without singing or chanting? As I understand it, a very high percentage of the state is in the purple territory, which means that they're not allowed to function at all. Yes, Your Honor, even without singing and chanting, gathering together large groups of people, hundreds of people, in this case, over a thousand people in the same indoor. Wait a minute. Wait a minute. Not every church is going to have a thousand people. As I understand counsel, he's talking about categories of limiting percentage of the normal congregation, or maybe you put a number of people limit on it. How come all of those opportunities are foreclosed for churches? Well, it's unclear if plaintiffs are seeking to impose restrictions to cap the houses of worship at a hundred people. I believe in their complaint, they've alleged that their congregation consists of over a thousand people. But even so, we've presented evidence that a large group of people, even up to a hundred people, indoors poses a greater risk of transmission than in other activities, like grocery shopping, or like going to the museum, or at gyms. We've presented evidence. Plaintiffs have presented no evidence to call into question any of the evidence that we've presented. So thinking about this, you and I and opposing counsel, we might disagree, but the fact that we're demonstrating this, and the plaintiffs have provided no reason to call into question that evidence. Counsel, is your scientific expert qualified to opine on religious matters such as the nature of interpersonal activities in the church service? Well, what he is qualified to opine on is how this virus transmits. So I'm talking about, do you have an expert that can identify what happens inside a church service? Not to talk about what happens inside a church service, but rather to talk about the way that this virus transmits in indoor gatherings, like a church service. So like a church service, like a movie theater, like a concert or a sporting event. When you say like, when you say like, are you talking about, that's not, do you mean with people in close proximity for extended period of time? And if so, what period of time? That's what I'm trying to get at. I really struggle with these comparators. Yeah, so he's testified that the longer people remain in the same enclosed space indoors, the greater probability of transmission. Whereas at grocery stores or at museums, people don't remain in the same proximity for extended periods of time. They're moving around a lot. Human to human interactions is relatively transitory. Whereas the point of gathering for sporting events or concerts or for worship is to engage in this communal activity for a long period of time. You know, whether that's an hour, some services or some concerts last an hour, that is still greater than the transitory activities of shopping or of going to the museum or going to the gym. Council. What about, sorry, go ahead, Judge Lawson. What guidance, if any, should we take from the Supreme Court rulings in South Bay United Pentecostal Church versus Governor Newsom? Is there any guidance for us in those rulings? Absolutely, Your Honor. In that case, we'll first talk about the South Bay decision from this court, when this court refused to enjoin worship restrictions that were actually more restrictive than they are now. So in this court's published decision in South Bay, it was issued at the end of May. At that time, all in-person worship services, indoor, outdoor, statewide, was prohibited. Yet this court in a published decision refused to enjoin that. In South Bay, similarly, the Supreme Court refused to enjoin the restrictions. And even though at the time, 25%, 100% was allowed for indoor services. But still, the main thing that we can take from that is Chief Justice Roberts' concurring opinion. And one thing I would like to talk about, especially in light of the fact that plaintiffs have presented no evidence to support any of their claims, is the traditional rule that the courts should defer to politically accountable public health policymakers who have wide discretion and are entitled to that deference, even if, and especially if, there is medical or scientific uncertainty. And Chief Justice Roberts, who relied on this principle, not on Jacobson, not only on cases involving states of emergency, but on United States versus Marshall, which was a Supreme Court case from 1974 that involved deferring to states' determination about the efficacy of drug rehabilitation programs. Again, it wasn't an emergency situation. Deference to politically accountable state officials has been applied in other non-emergency contests where individual liberties are at stake, such as involuntary confinement for mental health treatments, Kansas versus Hendricks, the Supreme Court, 1997, in the context of abortion rights, Gonzalez versus Carhartt, right to consume alcohol for medicinal purposes, Lambert versus Yellowlee, 1926, also the right to practice osteopathic medicine in Fallon versus Texas, 1912. And to be clear, the state is not calling for a wholesale deference to states' officials, but rather where there might be some scientific or medical uncertainty, and especially considering that plaintiffs have presented no evidence to support their comparative, their proposed comparatives, and they've presented no evidence to call into question Dr. Watt's testimony, the deference is warranted. And the reason for that is, it's ultimately, it's those public health officials who are these decisions that are accountable to the people, not the court. The public health officials are accountable to the people of California, and it's the people of California who are the ones who are at risk. Furthermore, that deference is even more compelling in light of the circumstances that we unfortunately find ourselves in. 200,000 Americans are dead, rates of death are about 1,000 a day, 15,000 Californians have died. There's also the serious long-term health effects that are instilled in people, even those who survived the disease. I'll remind the court that there's no vaccine, there's no cure, there's no widely effective treatment. The virus can spread even among those who are in the hospital. Let's be clear what's at stake here. It's serious death, serious risk of illness and death on a massive scale. And with the numerous and well-documented instances of so-called super spreader events being traced to large indoor gatherings, including houses of worship, that deference is especially potent. We've provided copious examples of unfortunate outbreaks to houses of worship, including where houses of worship have taken the same precautions that Plaintiffs in this case proposed that they'll take. Counselor, may I ask a question, please? I have a couple of questions. My understanding is that one of the comparators that the appellants are asking us to look to is the treatment of political rallies, political protesters. And under the current guidelines in your helpful, the parties, helpful filing that we got today, my understanding now is that indoor political protests are treated identically to indoor worship services. That's pursuant to the drop down menu. It's in footnote five of your brief today that there's a question and answer. May I participate in political protests? I read that to say that indoor political protests are now treated identically. Is that right? Yes, Your Honor. Okay. And outdoor political protests are treated identically to outdoor worship services. Is that right? Both outdoor political protests and outdoor worship have no capacity limit and may interest in each. So the answer to my question was a yes? Yes. They're treated identically. All right. And just to clear up something, because I think it got a little jumbled, my understanding is that secular and non-secular groups are not allowed either way to engage in singing or chanting. Is that right? I understand clearly that congregations may not, but I just want to make sure that I'm understanding correctly that other types of groups, secular groups, are not allowed to engage in singing and chanting. Yes, Your Honor. That's correct. What is comparable secular activity? Opposing counsel mentioned several, quite a number, shopping and you heard him go through the list. I'm still struggling with what is the most comparable activity that you understand them to be challenging? Well, they haven't identified comparable secular activity that's permitted or subject to more favorable or less stringent restrictions. Is your position that the most comparable activity would be the ones identified in South Bay? Sitting in a concert hall or theater or that type of activity? Political protests, movie theaters, concerts, sporting events. Okay, so what makes those comparable? Is it the closeness, the proximity of people, coupled with the length of time they sit there? What is it? They're comparable in terms of the risk of transmission. They both pose heightened risk of transmission and outbreak of the disease. Okay, that's the conclusion. I'm trying to get factually. That's why I'm really struggling. What are these activities and why are they comparable? It's really hard for me to compare grocery shopping to sitting next to somebody, you know, in my congregation. Right, and Dr. Watt describes this, that because people act both at houses of worship and in movie theaters, together in the same indoor enclosed space for an extended period of time, there's a greater chance that the virus will transmit from one person to another, especially given that the virus transmits even among those who show no symptom. And so at grocery stores, because you're not remaining in the same proximity with someone else for a long period of time, that probability is diminished, that probability of transmission. So when we're talking about comparable, we're talking about comparable in terms of risk of COVID transmission. And this is what our experts have talked about. Plaintiffs have presented no evidence to call into question. They presented no evidence to support their claim that going to the grocery store poses a greater risk in terms of COVID transmission than going to a concert or going to... To address opposing council's points about the charitable activities that they wish to do, I'll first note that plaintiffs provide no evidence or it's unclear exactly what these activities look like. If they are running a food pantry or a closed distribution center, then that would look like going to a retail or grocery store, which we've discussed. If they're engaging in religious counseling, they would be permitted to do so. I see my time is up. Council, your time has expired. Thank you very much. Thank you. Council, Mr. Staver, you have reserved three minutes and 37 seconds. Thank you, your honor. With regards to what is in the complaint and the comparisons on the place, it doesn't survive strict scrutiny, but it doesn't even survive rational basis to allow non-religious activity, which we've alleged they provide this counseling for the community at the Hope Center in this church without a numerical limitation, and it's always been exempted under J, K, and L of the complaint and under C of the joint statement. For people to come together with an unlimited percentage or numerical number to have counseling for unemployment or disability benefits in the church but not have religious services makes no rational basis, let alone survive strict scrutiny. It is the state's burden to prove that it has carried its burden on the strict scrutiny and to present evidence. The evidence that they say they presented has no data, no studies, nothing, and in fact, that was even before the blueprint when museums were not open. Council, the activities you're referring to, these peripheral activities that are performed by the church, are they done in a group fashion? Yes, they are. Hundreds of people come and are counseled at the same time? They can be, and it depends upon- What does the record say about those? The record doesn't say number, but it says that those activities occur, and they can you can't have any worship in those same buildings, so even if they have five people, that's a dissimilar treatment, and they clearly have groups of different sizes within these 162 churches and the Harvest Rock affiliates. The activity that makes no rational basis, let alone strict scrutiny, surviving, that you can bifurcate and that the church has to determine is the criminal charges versus non-criminal charges coming based upon not the location, not the number of people, but the kind of activity that occurs in the churches as a location, but even the experts that they say they have presented no documented studies or evidence, and it was before museums, and people congregated for periods of time with laundromats. They can stay there for hours waiting, sitting beside each other with the only social distancing requirement. Museums are the same thing. The recruitment on the face of this blueprint in Exhibit A is quite telling. Destination centers where people of church can go, that is a place where people will congregate, and there's a dissimilar treatment with regards to the numbers, with regards to whether it's a place of worship, and gyms. People are using the same equipment, fitness centers, and you have a dissimilar treatment, preferential treatment for gyms and facilities once you get through phase two. And also the family entertainment industry, the same thing. The satellite, car games, everybody has an idea of what would happen in a car game. You're going to be sitting together by close proximity with people, and yet they have no numerical top number that they can't exceed. But if it's worship, and you have the Bible around the same table, now the numerical number or the no worship ban kicks in. I see your honor. Counsel, thank you very much. Counsel, your time has expired. Thank you very much. Thank you. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Rawlinson, Christen